**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEDA CORTEZ, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GILDAN ACTIVEWEAR INC., GLENN J. CHAMANDY, RHODRI J. HARRIES, and LUCA BARILE,<br><br>Defendants. | **Case No:** 1:26-cv-2126 (AJB/DJS)<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Beda Cortez ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Gildan Activewear Inc. ("Gildan," "GIL," or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Gildan securities between February 19, 2025 and June 15, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act")

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

**PARTIES**

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Gildan securities during the Class Period and was economically damaged thereby.

7. Gildan describes its business as follows:

> Gildan is a leading vertically integrated manufacturer of everyday basic apparel, including activewear, underwear, and hosiery products. Our products are sold to wholesale distributors, screenprinters, and embellishers in North America, Europe, Asia-Pacific, and Latin America, as well as to retailers in North America, including mass merchants, department stores, national chains, specialty retailers, craft stores, and online retailers. We also manufacture products for global lifestyle brand companies who market these products under their own brands through their own retail establishments, ecommerce platforms, and/or to third-party retailers.

8. Defendant Gildan's principal executive offices are located at 600 de Maisonneuve Boulevard West, 33rd Floor, Montréal, Québec, Canada H3A 3J2. Gildan is incorporated in Canada. As such, this Court is a convenient forum due to its geographic proximity to Montréal.

9. Gildan has common shares listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "GIL."

10. Defendant Glenn J. Chamandy ("Chamandy") served as the Company's Chief Executive Officer ("CEO") and President throughout the Class Period.

11. Defendant Chamandy has previously been terminated by the Board of Directors as CEO, including due to behavior including recording a private phone call with the prior Chair of the Board, without that person's consent, and advocating risky business strategies without being able to answer basic questions regarding those plans. [2] Defendant Chamandy then was able to

---

[2] https://gildancorp.com/en/media/news/timeline-of-events-leading-up-to-CEO-removal/#:~:text=Chamandy.,right%20decision%20for%20the%20Company.

return to the CEO role, in a sequence of events discussed below (from the 2024 Report, as defined below):

> On December 11, 2023, the Company's then Board of Directors (the "Previous Board") announced the termination of the Company's President and Chief Executive Officer, Glenn Chamandy. On such date, the Previous Board appointed Vince Tyra as President and Chief Executive Officer, and Mr. Tyra took office in the first quarter of fiscal 2024, effective on January 15, 2024. Following the termination of Mr. Chamandy, shareholder Browning West and others initiated a campaign and proxy contest against the Previous Board, proposing a new slate of Directors and requesting the reinstatement of Mr. Chamandy as President and Chief Executive Officer. In the second quarter of 2024, on April 22, 2024, in advance of the May 28, 2024 Annual General Meeting of Shareholders ("Annual Meeting"), the Previous Board announced a refreshed Board of Directors ("Refreshed Board") that resulted in the immediate replacement of five Directors, with two additional Directors staying on temporarily but not standing for re-election at the Annual Meeting. On May 23, 2024, five days prior to the Annual Meeting, the Refreshed Board and Mr. Tyra resigned, along with Arun Bajaj, the Company's Executive Vice-President, Chief Human Resources Officer (CHRO) and Legal Affairs. The Refreshed Board appointed Browning West nominees to the Board of Directors (the "New Board"), effective as of that date. On May 24, 2024, the New Board reinstated Mr. Chamandy as President and Chief Executive Officer. On May 28, 2024, the New Board was elected by shareholders at the Annual Meeting. During fiscal 2024, the Company incurred significant expenses relating to the proxy contest, leadership changes and related matters, particularly in the first half of the year, primarily at the direction of the Previous Board and the Refreshed Board, which are referred to in section 5 of this MD&A entitled "Operating results" and explained in more detail in section 16.0 of this MD&A entitled "Definition and reconciliation of non-GAAP financial measures"

12. As discussed below, the refreshed Board of Directors has presided over Defendant Chamandy and other managers as Gildan engages in the channel stuffing scheme described below.

13. Chamandy's prior termination from the CEO role supports the inference that he acted with scienter throughout the Class Period.

14. Defendant Rhodri J. Harries ("Harries") served as the Company's Executive Vice-President, Chief Financial and Administrative Officer from the beginning of the Class Period until January 1, 2026.

15. Defendant Luca Barile ("Barile") has served as EVP, Chief Financial and Administrative Officer, since Defendant Harries' departure. Previously, Defendant Barile served as CFO, Sales, Marketing and Distribution.

16. Defendants Chamandy, Harries and Barile are collectively referred to herein as the "Individual Defendants."

17. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

18. Gildan is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

19. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

20. Gildan and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

21. On February 19, 2025, the Company filed with the SEC its annual report on Form 40-F for the fiscal year ended December 29, 2024 (the "2024 Annual Report"). Attached to the 2024 Annual Report were certifications pursuant to SOX signed by Defendants Chamandy and Harries attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22. Attached to the 2024 Annual Report as Exhibit 99.1 was Gildan's "2024 Report to Shareholders" (The "2024 Report").

23. The 2024 Report contained the following statement regarding Gildan's internal controls:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13(a)-15(f) and 15(d)-15(f) under the U.S. Securities Exchange Act of 1934 and under National Instrument 52-109.
>
> Our internal control over financial reporting means a process designed by, or under the supervision of, an issuer's certifying officers, and effected by the issuer's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP and includes those policies and procedures that: (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (2) are designed to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with International Financial Reporting Standards, and that our receipts and expenditures are being made only in accordance with authorization of our management and directors; and (3) are designed to provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of

> our assets that could have a material effect on the annual financial statements or interim financial reports.
>
> The design of any system of controls and procedures is based in part upon certain assumptions about the likelihood of certain events. There can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. As a result, due to its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> Under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, management conducted an evaluation of the effectiveness of our internal control over financial reporting, as at December 29, 2024, based on the framework set forth in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on that evaluation under this framework, our Chief Executive Officer and our Chief Financial Officer concluded that our internal control over financial reporting was effective as of December 29, 2024.***

24. The statement in ¶ 23 was materially false and misleading at the time it was made because Defendants engaged in a channel stuffing scheme to create an appearance of revenue.

25. The 2024 Report provided the following financial information:

GILDAN MANAGEMENT'S DISCUSSION AND ANALYSIS

**5.5 Select annual information**

| (in $ millions, except per share amounts or otherwise indicated) | 2024 | 2023 | 2022 | Variation 2024-2023 $ | Variation 2024-2023 % | Variation 2023-2022 $ | Variation 2023-2022 % |
|---|---|---|---|---|---|---|---|
| Net sales | **3,270.6** | 3,195.9 | 3,240.5 | **74.7** | **2.3 %** | (44.6) | (1.4)% |
| Gross profit | **1,003.7** | 880.1 | 992.4 | **123.6** | **14.0 %** | (112.3) | (11.3)% |
| Adjusted gross profit[(1)] | **1,003.7** | 876.9 | 965.5 | **126.7** | **14.5 %** | (88.6) | (9.2)% |
| SG&A expenses | **390.8** | 330.4 | 326.3 | **60.4** | **18.3 %** | 4.1 | 1.3 % |
| Adjusted SG&A expenses[(1)] | **308.1** | 324.1 | 326.3 | **(16.0)** | **(4.9)%** | (2.2) | (0.7)% |
| Gain on sale and leaseback | **—** | (25.0) | — | **25.0** | **n.m.** | (25.0) | n.m. |
| Net insurance gains | **—** | (74.2) | — | **74.2** | **n.m.** | (74.2) | n.m. |
| Restructuring and acquisition-related (recoveries) costs | **(5.3)** | 45.8 | 0.5 | **(51.1)** | **n.m.** | 45.3 | n.m. |
| Impairment (Impairment reversal) of intangible assets, net of write-downs | **—** | (40.8) | 62.3 | **40.8** | **n.m.** | (103.1) | n.m. |
| Operating income | **618.2** | 643.9 | 603.4 | **(25.6)** | **(4.0)%** | 40.5 | 6.7 % |
| Adjusted operating income[(1)] | **695.6** | 552.8 | 639.3 | **142.8** | **25.8 %** | (86.4) | (13.5)% |
| Adjusted EBITDA[(1)] | **833.8** | 674.5 | 764.2 | **159.3** | **23.6 %** | (89.7) | (11.7)% |
| Financial expenses | **104.2** | 79.7 | 37.0 | **24.5** | **30.7 %** | 42.7 | 115.4 % |
| Income tax expense | **113.2** | 30.6 | 24.9 | **82.6** | **n.m.** | 5.7 | 22.9 % |
| Net earnings | **400.9** | 533.6 | 541.5 | **(132.7)** | **(24.9)%** | (7.9) | (1.5)% |
| Adjusted net earnings[(1)] | **489.7** | 452.6 | 574.7 | **37.1** | **8.2 %** | (122.1) | (21.2)% |
| Basic EPS | **2.46** | 3.03 | 2.94 | **(0.57)** | **(18.8)%** | 0.09 | 3.1 % |
| Diluted EPS | **2.46** | 3.03 | 2.93 | **(0.57)** | **(18.8)%** | 0.10 | 3.4 % |
| Adjusted diluted EPS[(1)] | **3.00** | 2.57 | 3.11 | **0.43** | **16.7 %** | (0.54) | (17.4)% |
| Gross margin[(2)] | **30.7 %** | 27.5 % | 30.6 % | **n/a** | **3.2 pp** | n/a | (3.1) pp |
| Adjusted gross margin[(1)] | **30.7 %** | 27.4 % | 29.8 % | **n/a** | **3.3 pp** | n/a | (2.4) pp |
| SG&A expenses as a percentage of net sales[(3)] | **11.9 %** | 10.3 % | 10.1 % | **n/a** | **1.6 pp** | n/a | 0.2 pp |
| Adjusted SG&A expenses as a percentage of net sales[(1)] | **9.4 %** | 10.1 % | 10.1 % | **n/a** | **(0.7) pp** | n/a | — |
| Operating margin[(4)] | **18.9 %** | 20.1 % | 18.6 % | **n/a** | **(1.2) pp** | n/a | 1.5 pp |
| Adjusted operating margin[(1)] | **21.3 %** | 17.3 % | 19.7 % | **n/a** | **4.0 pp** | n/a | (2.4) pp |
| Total assets | **3,715.1** | 3,514.9 | 3,440.2 | **200.2** | **5.7 %** | 74.7 | 2.2 % |
| Total non-current financial liabilities | **1,235.9** | 685.0 | 780.0 | **550.9** | **80.4 %** | (95.0) | (12.2)% |
| Net debt[(1)] | **1,568.6** | 993.4 | 873.6 | **575.2** | **57.9 %** | 119.8 | 13.7 % |
| Diluted weighted average number of common shares outstanding (in '000s) | **163,179** | 176,224 | 184,532 | **n/a** | **n/a** | n/a | n/a |
| Return on adjusted average net assets (Adjusted RONA)[(1)] | **17.9 %** | 16.2 % | 21.0 % | **n/a** | **1.7 pp** | n/a | (4.8) pp |
| Annual cash dividends declared per common share | **0.820** | 0.744 | 0.676 | **0.076** | **10.2 %** | 0.068 | 10.1 % |
| Net debt leverage ratio[(1)] | **1.9** | 1.5 | 1.1 | **n/a** | **n/a** | n/a | n/a |

n.m. = not meaningful
n/a = not applicable
(1) This is a non-GAAP financial measure or ratio. See section 16.0 "Definition and reconciliation of non-GAAP financial measures" in this MD&A.
(2) Gross margin is defined as gross profit divided by net sales.
(3) SG&A as a percentage of sales is defined as SG&A divided by net sales.
(4) Operating margin is defined as operating income (loss) divided by net sales.
Certain minor rounding variances exist between the consolidated financial statements and this summary.

26. The net sales metric provided in ¶ 25 was materially false and misleading at the time it was made because it was materially inflated as a result of a channel stuffing scheme.

27. On February 26, 2026, the Company filed with the SEC its annual report on Form 40-F for the fiscal year ended December 28, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report were certifications pursuant to SOX signed by Defendants Chamandy and Barile attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

28. Attached to the 2025 Annual Report as Exhibit 99.1 was Gildan's "2025 Report to Shareholders" (The "2025 Report").

29. The 2025 Report contained the following statement regarding Gildan's internal controls:

> As stated in the Canadian Securities Administrators' National Instrument 52-109, *Certification of Disclosure in Issuers' Annual and Interim Filings* and Rules 13a-15(e) and 15d-15(e) under the *U.S. Securities Exchange Act of 1934*, as amended, disclosure controls and procedures means controls and other procedures of an issuer that are designed to provide reasonable assurance that information required to be disclosed by the issuer in its annual filings, interim filings, or other reports filed or submitted by it under securities legislation is recorded, processed, summarized, and reported within the time periods specified in the securities legislation and include controls and procedures designed to ensure that information required to be disclosed by an issuer in its annual filings, interim filings, or other reports filed or submitted under securities legislation is accumulated and communicated to the issuer's management, including its certifying officers, as appropriate to allow timely decisions regarding required disclosure.
>
> An evaluation of the effectiveness of our disclosure controls and procedures as of December 28, 2025 was carried out under the supervision of, and with the participation of, our management, including our Chief Executive Officer and our Chief Financial Officer.
>
> ***For the year ended December 28, 2025, we limited the scope of our evaluation of disclosure controls and procedures (DC&P) to exclude disclosure controls and procedures of HanesBrands LLC ("Hanes"),*** a subsidiary acquired by the Company in connection with an acquisition consummated on December 1, 2025, the results of which are included in the audited annual consolidated financial statements of the Company for the year ended December 28, 2025, to the extent Hanes' disclosure controls and procedures are subsumed by the Company's internal controls over financial reporting (ICFR).The consolidated results of the Company for the year ended December 28, 2025 included net sales and net loss of $217 million and $17 million, respectively, relating to Hanes' results of operations since the date of acquisition. Hanes accounted for approximately $2,470 million of current assets, $3,858 million of non-current assets, $1,078 million of current liabilities, and $1,731 million of non-current liabilities, in the Company's audited consolidated statement of financial position as at December 28, 2025.
>
> ***Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 28, 2025***.

30. The statement in ¶ 29 was materially false and misleading at the time it was made because Defendants engaged in a channel stuffing scheme to create an appearance of revenue. In

addition, Defendants engaged in channel stuffing relating to Hanes and, as a result, the statement was materially false and misleading as a result of the failure to disclosure material issues at Hanes.

31. The 2025 Report provided the following financial information:

GILDAN MANAGEMENT'S DISCUSSION AND ANALYSIS

**5.5 Select annual information**

| (in $ millions, except per share amounts or otherwise indicated) | 2025 | 2024 | 2023 | Variation 2025-2024 $ | % | Variation 2024-2023 $ | % |
|---|---|---|---|---|---|---|---|
| Net sales | **3,619.2** | 3,270.6 | 3,195.9 | **348.6** | **10.7 %** | 74.7 | 2.3 % |
| Gross profit | **1,129.9** | 1,003.7 | 880.1 | **126.2** | **12.6 %** | 123.6 | 14.0 % |
| Adjusted gross profit(1) | **1,165.3** | 1,003.7 | 877.0 | **161.6** | **16.1 %** | 126.7 | 14.4 % |
| SG&A expenses | **389.4** | 390.8 | 330.4 | **(1.4)** | **(0.4)%** | 60.4 | 18.3 % |
| Adjusted SG&A expenses(1) | **386.6** | 308.1 | 324.1 | **78.5** | **25.5 %** | (16.0) | (4.9)% |
| Gain on sale and leaseback | **—** | — | (25.0) | **—** | **n.m.** | 25.0 | n.m. |
| Net insurance gains | **—** | — | (74.2) | **—** | **n.m.** | 74.2 | n.m. |
| Restructuring and acquisition-related costs (recoveries) | **120.6** | (5.3) | 45.8 | **125.9** | **n.m.** | (51.1) | n.m. |
| Impairment (Impairment reversal) of intangible assets, net of write-downs | **—** | — | (40.8) | **—** | **n.m.** | 40.8 | (100.0)% |
| Operating income | **619.9** | 618.2 | 643.9 | **1.7** | **0.3 %** | (25.7) | (4.0)% |
| Adjusted operating income(1) | **778.7** | 695.6 | 552.9 | **83.1** | **12.0 %** | 142.7 | 25.8 % |
| Adjusted EBITDA(1) | **926.3** | 833.8 | 674.5 | **92.5** | **11.1 %** | 159.3 | 23.6 % |
| Financial expenses | **148.7** | 104.2 | 79.7 | **44.6** | **42.8 %** | 24.5 | 30.7 % |
| Income tax expense | **77.3** | 113.2 | 30.6 | **(36.0)** | **(31.8)%** | 82.6 | n.m. |
| Adjusted income tax expense(1) | **100.7** | 101.8 | 20.6 | **(1.1)** | **(1.1)%** | 81.2 | n.m. |
| Net earnings | | | | | | | |
| Continuing operations | **393.9** | 400.9 | 533.6 | **(6.9)** | **(1.7)%** | (132.7) | (24.9)% |
| Discontinued operations (net of tax) | **4.9** | — | — | **4.9** | **n.m.** | — | n.m. |
| Total net earnings | **398.9** | 400.9 | 533.6 | **(2.0)** | **(0.5)%** | (132.7) | (24.9)% |
| Adjusted net earnings from continuing operations(1) | **538.0** | 489.7 | 452.6 | **48.3** | **9.9 %** | 37.1 | 8.2 % |
| Basic earnings per share | | | | | | | |
| Continuing operations | **2.57** | 2.46 | 3.03 | **0.11** | **4.5 %** | (0.57) | (18.8)% |
| Discontinued operations | **0.04** | — | — | **0.04** | **n.m.** | — | n.m. |
| Total | **2.61** | 2.46 | 3.03 | **0.16** | **6.1 %** | (0.57) | (18.8)% |
| Diluted earnings per share | | | | | | | |
| Continuing operations | **2.57** | 2.46 | 3.03 | **0.11** | **4.5 %** | (0.57) | (18.8)% |
| Discontinued operations | **0.04** | — | — | **0.04** | **n.m.** | — | n.m. |
| Total | **2.61** | 2.46 | 3.03 | **0.15** | **6.1 %** | (0.57) | (18.8)% |
| Adjusted diluted EPS from continuing operations(1) | **3.51** | 3.00 | 2.57 | **0.51** | **17.0 %** | 0.43 | 16.7 % |
| Gross margin(2) | **31.2 %** | 30.7 % | 27.5 % | **n/a** | **0.5 pp** | n/a | 3.2 pp |
| Adjusted gross margin(1) | **32.2 %** | 30.7 % | 27.4 % | **n/a** | **1.5 pp** | n/a | 3.3 pp |
| SG&A expenses as a percentage of net sales(3) | **10.8 %** | 11.9 % | 10.3 % | **n/a** | **(1.1) pp** | n/a | 1.6 pp |
| Adjusted SG&A expenses as a percentage of net sales(1) | **10.7 %** | 9.4 % | 10.1 % | **n/a** | **1.3 pp** | n/a | (0.7) pp |
| Operating margin(4) | **17.1 %** | 18.9 % | 20.1 % | **n/a** | **(1.8) pp** | n/a | (1.2) pp |
| Adjusted operating margin(1) | **21.5 %** | 21.3 % | 17.3 % | **n/a** | **0.2 pp** | n/a | 4.0 pp |

n.m. = not meaningful
n/a = not applicable
(1) This is a non-GAAP financial measure or ratio. See section 16.0 "Definition and reconciliation of non-GAAP financial measures and related ratios" in this MD&A.
(2) Gross margin is defined as gross profit divided by net sales.
(3) SG&A as a percentage of sales is defined as SG&A divided by net sales.
(4) Operating margin is defined as operating income (loss) divided by net sales.
Certain minor rounding variances exist between the consolidated financial statements and this summary.

32. The net sales metric provided in ¶ 31 was materially false and misleading at the time it was made because it was materially inflated as a result of a channel stuffing scheme.

33. The statements contained in ¶¶ 23, 25, 29, 31 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Gildan did not have adequate internal controls; (2) Gildan used channel stuffing to create an appearance of revenue; and (3) as a result, Defendants'

statements about Gildan's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

**THE TRUTH BEGINS TO EMERGE**

34. On June 16, 2026, Jehoshaphat Research ("Jehoshaphat") published a report in which it announced that it had a short position in Gildan securities (the "Report").

35. Summarizing the Report, during market hours on June 16, 2026, Investing.com published an article entitled "Gildan Activewear stock falls after short seller report." The article stated the following:

> [Gildan shares fell] following the release of a short report from Jehoshaphat Research questioning the company's organic growth and sales practices.
>
> The research firm disclosed a short position in the Canadian apparel manufacturer, ***claiming that the company's organic growth has been negative for years despite appearing to show revenue growth. Jehoshaphat Research stated that this underlying decline has been obscured by financial engineering***.
>
> The short seller alleged that Gildan ***has been "stuffing" its distributors and customers with excess product beyond underlying end user demand***. According to the report, this ***has created a product overhang worth approximately $500 million, which contrasts with consensus forecasts for 2026.***
>
> ***The report cited accounts from former employees and distributors describing aggressive practices,*** including ones that ***"compel the distributors to bring forward some purchases" and offering extended terms at quarter-ends to "move sales from Q2 to Q1."***
>
> Jehoshaphat Research also questioned whether these practices began around 2024, following the mass resignation of Gildan's board of directors. ***The firm suggested the new board may be less interested in overseeing management than the previous board***.
>
> ***The short seller noted that the acquisition of Hanes presents additional challenges for the company***, though specific details were not provided in the summary. The full short thesis, including detailed analysis and the firm's financial interest disclosures, is available on Jehoshaphat Research's website.

36. The Report itself stated that Gildan "has been stuffing the channel for several years, persistently and increasingly, resulting in disproportionate outstanding receivables at each

successive quarter end." Further, "[w]e believe GIL has done this to bring future revenues forward, and that it has recently pulled forward around $500m of revenues – revenues that have essentially come out of the upcoming quarters in 2026 – ***along with overstating its revenue and growth for several years***."

37. The Report further stated that "we estimate GIL's revenues would have been *declining* for the past 3 years if not for heavy channel stuffing. The Street fails to understand the unlikely acceleration that would be required for this business to grow at 5% annually." Further, the Report stated that "'True' or underlying GIL revenues have followed the path of Hanes and Fruit of the Loom since 2023 (down). ***The delta is accounting vapor***."

38. The Report stated that the channel stuffing problem was concentrated at one distributor, which was "sitting on over *six months* of unpaid Gildan product" right after Christmas."

39. The Report included the following exchange between Jehoshaphat and a former Gildan employee, corroborating the channel stuffing allegation (formatting and highlighting altered from original):

> **Jehoshaphat:** You mentioned something along the lines of incentivizing distributors to have a certain supply that's different from the norm. What do you mean by that?
>
> **Former employee**: The sales team at Gildan has a very close relationship with all the different distributors. ***If there was a sense that we might not hit the sales numbers that we had communicated to the market, the sales team would offer incentives to the distributors to take on more weeks of supply than they normally had***, or rebates at the end of the quarter, or more favorable payment terms. ***These are all mechanisms that were used to compel the distributors to bring forward some purchases***.
> **Jehoshaphat**: We've seen other public companies do that as well. Did that start at a certain time, or was that always the case when you were at Gildan?
>
> **Former Employee**: It was always there, ***but it depended on how strong the quarter was relative to the forecast and what had been communicated on prior calls***. There was less of a need to do it for some quarters, more of a need for other quarters.

> **Jehoshaphat:** If you're pulling forward some of that revenue into this quarter, what would happen at the end of next quarter?
>
> **Former Employee**: ***If you're bringing forward the demand one quarter earlier, eventually it's going to catch up to you at some point***, but my whole time there that was never an issue. We always found a way to push the sales. It's a question I had as well while I was there, but it never seemed to be an issue because of how aggressive the sales team has been in terms of getting the numbers to the finish line. They're always able to deliver, even though they'd move sales from Q2 to Q1, then they'd repeat the same song and dance in Q2. Then they'd do it again in Q3.

40. The Report contained the following exchange between Jehoshaphat and a "Distributor of GIL apparel", discussing the lengths Gildan would go to in order to get sales, as alluded to above by the "former employee" (formatting edited from original, text alterations in original):

> **Distributor**: At the end of 2025, [GIL] got super aggressive, they were basically giving sh*t away, like GIVING it away in order to get the sales. . . . [And back to what you asked about], now their receivables are way outta place because, I guarantee you, they offered these people to Buy this product, and we will give you 120 days net terms if you'll buy it today. There were some big, big buys, I'm talking like 40, 50 containers at a time, and a container is 72,000 pieces.
>
> **Jehoshaphat**: You're saying that they, Gildan, went to distributors and said, like, *Just take this product and we'll give you 120 days to pay?* And that's not normal?
>
> **Distributor**: Yeah, so take the direct customer Mad Engine, they're probably the biggest direct buyer of blank goods out there. Gildan went to them in Q4 of 2025 and said, *Hey, if you buy 40 or 50 containers from us in Q4 of 2025, we will give you extended terms on this…*
>
> **Jehoshaphat**: Yeah, so the extended terms is kind of ringing a bell for me, because it seems like this is what would cause receivable days to go up. So when you say they gave extended terms, like what are normal terms and then what are extended terms?
>
> **Distributor:** So normal terms is 30-day net for distributors, but to inventory this [much] product and keep it on the shelf, they're basically pulling these orders forward on potential s**t that's gonna happen down the road, right? So in order for them to do that, [GIL] will say, Hey, we'll give you 90 days to pay us. Because [Distributor's] gotta sell through that inventory, it's gonna take them two or three months to sell through it. I have heard of a few getting 120 days, but the most normal deal for Gildan to do if you'll pull orders forward like that is 90-day terms.

**Jehoshaphat:** So basically what's going on here is Gildan did fine in Q425, but they did that just by throwing product at people and saying, just, *Yeah, pay us much later?*

**Distributor:** Yeah, that's pretty much what it was . . .

**Jehoshaphat:** So it sounds like Q425 was particularly aggressive, but have you known Gildan to be aggressive like that in the past, as compared to other companies?

**Distributor**: ***Yeah, I think so…In my opinion, it was always Gildan trying to hit a number to appease someone*. *I don't know who it was, but they were trying to hit a number.***

41. The Report included the following exchange between Jehoshaphat and a non-distributor customer (formatting updated from original), discussing the unusual nature of Gildan's sales tactics:

**Customer**: Given the volume [we were] purchasing on a monthly basis, ***we collaborated with Gildan on increasing buys toward the end of each quarter – if it made sense – to aid them in hitting their quarterly sales goals.***

**Jehoshaphat:** . . . Did you by any chance have more of these conversations in recent years?

**Customer:** As their volume with us increased, the end-of-quarter conversations definitely became more frequent. Like, I don't think in the last year and a half [that I was with my company, there was a quarter in which] I wasn't either getting hit up by my COO because [Gildan's] higher-up guy wasn't reaching out to him to say, ***Hey, can you take more units, or my VP sales contact wasn't reaching out to me to ask the same thing. It was common, yeah, it was probably every quarter for sure***.

**Jehoshaphat:** Did other manufacturers do this too, like Fruit of the Loom?

**Customer:** No! (Laughs.) No, ***it surprised me the first time that Gildan reached out to us and was like, 'Hey, we're short by X number of units for the quarter, can you take them?' The first time that conversation came up, I was like, what?*** Why? (Laughs.) But then it became business as usual in a sense, and then [at quarter-end] it got to be like, okay, well, [my Gildan rep]'s gonna be calling me, you know, in the next couple of days to ask me the question.

**Jehoshaphat:** When was the first time?

**Customer:** I wanna say like towards the end of Q1 2024. There was a solid 2024 for sure, ***and then into 2025 we were getting regular conversations of 'Can you take more of this? Can you take more of this?'…and they shot themselves in the foot…we just kept rolling***

***that over month to month because it was just decreasing my future demand***…I think their salespeople were given really aggressive sales projections ***and if they couldn't hit it, they probably went to their biggest volume customers and said, Hey can you guys help us out to hit our numbers***?

**Jehoshaphat**: And when you said the end of the quarter, was it like the last week or the last two weeks?

**Customer**: It would be ***leading up to the last week because they wanted the units to ship within the quarter***. If I remember correctly, ***their books were managed by ship date, so as long as those goods shipped from whatever DC location they left within the quarter, they counted for quarter sales***…

**Jehoshaphat**: And then the conversation – so you would get a call from the Gildan sales rep or the regional VP and they would say, what – what would they offer in exchange for doing this?

**Customer**: ***Sometimes we got better terms on those goods***. Like if we took, depending on how sizeable the order was, we would negotiate different terms. So either extended terms, or we would push to like 90 days, or to 60 days. But more often than not, we weren't negotiating different [terms], we basically qualified it with, ***If I take additional units that I wasn't planning in my forecast to help you guys out, you need to be aware that my forecast for next quarter may be smaller as a result because I'm taking in this extra inventory***. So it was kind of like a payoff in a sense of like, I can help you out this quarter, but my next quarter may be smaller because I'm taking in these additional units. But then at the end of the next quarter they would call again and… yeah [laughs]…

We would give them quarterly forecasts of our needs, and refine it weekly based on new data. So we were giving them an updated forecast every week.

**Jehoshaphat:** So you gave them these ongoing forecasts, and they knew that, so when they were calling, were they really just trying to say, like, *Can you do us a favor*?

**Customer**: ***Yeah, it was definitely premised as a favor***.

**Jehoshaphat**: …So how did the terms and things like that work?

**Customer**: Our standard terms with them were net-30 days. And then if we negotiated longer terms with them…If we took in these extra goods at the end of the quarter, 9 times out of 10, we would be saying, Okay, we'll bump out the terms. Sometimes it was only 45 days, or it could be 60. We didn't usually go 90, that was usually reserved for taking full containers, or if the volume that we agreed to take at the end of the quarter would be significantly more than we were anticipating we would need – like, for example, [a seven figure number] units. ***Then I would say, you know, You're giving us extended terms to 90 days, because this is way more inventory than we anticipated taking in***.

**Jehoshaphat**: And how often would that happen?

**Customer:** I can remember two times specifically that my [GIL] rep came to me and said, *Hey, I need you guys to take this much in*, and I remember being a little stunned, because my last forecast that I had shared with them was I needed [X] units over the next six weeks. And then they came to me and said, *Oh by the way, we would really love for you to take [approximately 4X that]*. You want me to take that in all at once? So when you get something like that, you're like, wow. I told my [sales] rep that this is above my pay grade, and that's when it went to [another officer at my company] for approval. And I think that's when the VP [from GIL] started just going to him first, like cutting out the middleman. I remember that being two times overall…

**Jehoshaphat:** Did they ever come back, when you pushed back on a deal, and offer 120 days?

**Customer**: ***Yeah I would say once or twice, it was like, you could tell they were a little bit hard up for the business…Through 2024 and 2025 this was getting more and more frequent***. Like, isn't there an upper limit on this where it has to be reset, at some point, and you just don't buy anything for a whole quarter, or six weeks, or twelve weeks? ***But for whatever crazy intervention by the universe, we would get like a surprise Walmart order out of nowhere that would eat up 300, 400,000 units and things would right-size. But there were definitely times where our orders would [fall for a short while] because we took in so much so recently, and [the GIL rep] always got disappointed by that, they didn't hide that very well***. **So I'd say, *Look, we took in [a gigantic order] just recently, [6 times our forecast], and so I'm not really sure what you expected to happen*! Like, math is math, it's one of those few black and white things that we live in**.

**Jehoshaphat:** Was there ever a time when you would say no, but maybe your [C-suite person] would be like, *I got a call, and we have to make this order work*.

**Customer:** Yeah, that definitely happened, yeah . . .

**Jehoshaphat:** Was Fruit of the Loom calling you guys and asking you to take more, like Gildan was?

**Customer:** They might call me and say, *Hey, we're gonna run a special on this item because we're overstocked* so I'll give you a discount on it. But it was never like, I need you to take it. ***It was never in the same vein as it was with Gildan…***

**Jehoshaphat:** Was anyone, besides Gildan, coming to you at the end of the quarter and asking like this?

**Customer:** No. [One other company] might come to us and be like, *We'd love it if you could bump up your stock with us*, but it was never like "I need you to do this for us" kind of thing with anyone else, that was Gildan exclusively.

42. The Report quoted a separate former employee, who stated the following:

> There's that last two weeks [of the quarter] where there's a lot of, for instance, Gildan offering to pay freight, if we can get it out the door, instead of the retailer or customer normally paying it. Or a situation where we're telling a distributor, take another $5 million of the product and, we'll, you know, you don't have to pay for it until, we'll give you an extra month or two. ***So that definitely does happen…It would happen more with our distributors than anyone else, because they were mostly privately held companies so they had more ability to do that***.

43. The Report included the following exchange with another source, an employee at Hanes, which had been acquired by Gildan, who "explained in general terms why the apparel distributor channel is so ripe with opportunities for creating the appearance of sales in a given quarter":

> **Jehoshaphat**: I'm looking at the financial numbers we have from Gildan and trying to understand this…**I'm wondering if at the end of 2025 Gildan might have stuffed the distributor channel after closing the Hanes acquisition**.
>
> **Former Hanes employee**: Oh, I understand what you're saying and I think you're going down the right path. So the beauty of that distributor channel is it just helped you make your year to a certain extent. Hanesbrands, Gildan, S&S, everyone kind of understands this model. ***If we're carrying a lot of inventory that we want to get off the books before year-end or we're just trying to hit a sales target for the quarter, you go to your distributors and basically incent them to take some at the very end of the year***. And then you try to make it up the next year someplace else. That's kind of the beauty of the printwear space, you basically have distributors willing to work with you because they have their own economic incentives to carry this inventory, because of the price and incentives you're providing…I think the reason you're pointing to is exactly he reason why it [GIL's AR and concentration at one distributor] would look that way.

44. The Report stated the following, raising the concern that Gildan may be engaging in improper revenue recognition (and then included exchanges supporting a conclusion):

> Testimony below appears to describe transactions in which GIL ships product to customers without requiring payment until the customer later sells it through; the word "consignment" is even used by at least one. ***But we don't see evidence of GIL using traditional inventory consignment – because GIL doesn't mention using "inventory consignment" anywhere in its SEC filings that we could find***. Therefore, to the extent GIL may be engaging in any transactions like those described below, ***we believe the evidence may support a conclusion that it is recognizing the revenue in such transactions upon shipment to the customer. In other words, GIL may be giving***

> ***customers product and letting them hold it without paying, apparently indefinitely, but calling that shipment a sale.*** We say "may be" because we don't have the insight necessary to draw a conclusion with certainty about the accounting treatment for such transactions.

45. The Report stated the following under the heading "New Board with new attitude started in 2024" (internal citations omitted):

> In late 2023, the Board of Directors threw out Glenn Chamandy as CEO. Shareholders didn't respond well to this, so the Board explained their decision as driven by concern that he was **"Struggle[ing] to find additional avenues of long-term organic growth"** and wanted to pursue high-risk acquisitions, among other problems.
>
> A long proxy fight. ***In April 2024, the then-Chairman and four other directors were replaced after what GIL said was "extensive feedback from shareholders." A month later, the entire Board (old and new members) resigned***. The activist investors who led the proxy fight installed an entirely new slate of directors, and the new Board promptly reinstated Chamandy as CEO, in "a dramatic reversal from less than six months ago when he was abruptly terminated."
>
> We can't imagine a better backdrop for a Board of Directors to be effectively neutered in their ability or willingness to provide oversight of Management. ***When the last Board tried to exercise some oversight and fire the CEO, they got thrown out***. The replacement Board was handpicked by vocal investors who had spent the last six months telling the world how great the CEO is – and how terrible the old Board was! The first act of the replacement Board was to reinstate the fired CEO.
>
> And then later in 2024, the creeping DSO expansion turned into an explosion – while the company seems to have miraculously solved the organic growth problem that the old Board was so concerned about!
>
> Golly, people must be lining up in *droves* to join the Audit Committee!

46. The Report contained the following under the heading "Three seniormost people on Ethics & Fraud Compliance Committee resign":

> One GIL committee that people are not lining up in droves to join is the Ethics and Fraud Compliance Committee. It appears that all three seniormost people on that team have resigned since the "Board refresh."

47. On this news, Gildan's NYSE-listed shares fell $11.63 per share, or 18.7%, to close at $50.34 on June 16, 2026.

48. On the same day, Gildan issued a press release entitled "Gildan Activewear Issues Statement Regarding Recent Short Seller Report." The press release stated the following:

> [Gildan] is aware of a report published by a short seller on June 16, 2026. The Company is confident that its current disclosure provides its investors with accurate and comprehensive information regarding Gildan, including with respect to its financial information and governance practices.
>
> The Company reiterates its fiscal 2026 guidance as communicated in its April 30, 2026 press release.
>
> Gildan does not intend to provide any further comment at this time.

49. By issuing such a concise response to the Report, on the same day that it was issued (meaning that the Company certainly did not have time to investigate the Report's allegations), and not offering any more detailed response since, Gildan has failed to provide a competing inference to the allegation that Defendants fraudulently use channel stuffing to create an appearance of revenue. This is particularly problematic in this instance, considering that Gildan's CEO has previously been terminated for misconduct. As such, Gildan's conclusory and hasty response to the Report is consistent with the Report's allegation that Gildan's Board is not inclined towards vigorous oversight of Gildan's management.

50. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants

who acquired Gildan securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

53. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

57. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;
- as a public issuer, the Company filed public reports;
- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press

releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

58. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

59. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

60. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

64. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

65. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

66. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

67. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

68. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

69. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

70. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

72. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

73. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

74. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Plaintiff and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 15, 2026

**THE ROSEN LAW FIRM, P.A.**
/s/ Phillip Kim, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*